# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

YOUMING JIN *et al.*,      :
           :
    Plaintiffs,    :  Civil Action No.:  02-627 (RMU)
           :
    v.       :
           :
MINISTRY OF STATE SECURITY *et al* ., :
           :
    Defendant.   :

## MEMORANDUM OPINION

### Preserving Claims II & IX; Dismissing *Sua Sponte* the Plaintiffs' Remaining Claims for Lack of Subject-Matter Jurisdiction

## I. INTRODUCTION

The plaintiffs, 51 Falun Gong[1] practitioners who are visiting Chinese nationals, U.S. residents, or U.S. citizens, allege violations of their rights under the Constitution and federal and state law by persons and entities associated with the People's Republic of China ("PRC").  They bring suit against the PRC Ministry of State Security and the PRC Ministry of Public Security (collectively, "defendant ministries"), PRC national broadcasting entity China Central Television ("CCTV"), various PRC embassy and consulate officials, several unidentified persons employed by the PRC, the head of a Chinese-American association, and China Television Corp., Inc. (collectively, "the defendants" or the "government").

---

[1]  Falun Gong is a "very popular form of qigong (the general term used to describe several different organized practices of exercise and meditation)."  Compl. ¶ 37.  "Falun Gong distinguishes itself from other such practices by emphasizing not only physical growth but also development of one's moral character by adherence to the basic principles in daily living of Truthfulness, Compassion, and Forbearance."  *Id.*

Before the court is the defendants' motion to dismiss the current action for lack of subject-matter jurisdiction.[2]  Because claims II and IX of the plaintiffs' amended complaint involve commercial activity within the meaning of the Foreign Sovereign Immunities Act ("FSIA") and because a nexus exists between these two causes of action and the alleged commercial activity, the court has federal subject-matter jurisdiction over these two causes of action.  However, because the remaining claims are not based upon a commercial activity or a non-discretionary tort activity within the meaning of FSIA, the defendants are entitled to sovereign immunity from suit.  Accordingly, the court *sua sponte* dismisses the remaining claims.

## II.    BACKGROUND

### A.    Factual Allegations

The plaintiffs all practice Falun Gong, a self-improvement practice or discipline similar to Tai Chi which has its roots in ancient Chinese culture.  Am. Compl. ¶ 36.  According to the

---

[2]    Presently before the court are two separate documents arguing for dismissal.  The first is a suggestion by the China Society of Private International Law ("Society"), hereinafter "Suggestion," which the court ordered published in the case file on July 12, 2005.  The second is a renewed suggestion, also by the Society, hereinafter "Renewed Suggestion," filed on February 10, 2006.  Unsure of the China Society of Private International Law's relationship to the defendants in this case, the court provided the plaintiffs with an opportunity to file a substantive response to these documents.  Order (Dec. 12, 2005).  Because the court has an obligation to consider its jurisdiction *sua sponte*, *Verlinden v. Cent. Bank of Nigeria*, 461 U.S. 408, 493-94 (1982), and having provided the plaintiffs with an opportunity to substantively respond, the court proceeds with an analysis of the defendants' sovereignty vis-a-vis this case, and construes the Society's Suggestion and Renewed Suggestion as amicus briefs in support of dismissal.  *Kitzmiller v. Dover Area School Dist.*, 2005 WL 2736500 *1 (D. Md. Oct. 24, 2005) (reviewing an amicus brief despite the party's failure to file a motion for leave to file the brief); FED. R. CIV. P. 1.  The "'just speedy, and inexpensive determination of every action' [constitutes] the touchstones of federal procedure."  *Redding & Co. v. Russwine Const. Corp.*, 417 F.2d 721, 724 (D.C. Cir. 1969) (quoting FED. R. CIV. P. 1.).

plaintiffs, Falun Gong has become a very popular form of exercise and meditation in China since the government loosened controls after the Cultural Revolution. *Id.* ¶ 37. The plaintiffs report that since its introduction into China in 1992, the number of Falun Gong practitioners has grown rapidly, reaching more than 70 million in number by 1999. *Id.*

The plaintiffs allege that Falun Gong was initially well received in China for its health benefits, obtaining numerous awards and counting many government officials and senior Communist members among its practitioners. *Id.* ¶ 38. They claim, however, that the Chinese government began to perceive the spectacular growth of Falun Gong as a threat to state security, national stability and economic development. *Id.* ¶¶ 39-40. The plaintiffs assert that in 1996, after the government's limited success in early efforts to control the Falun Gong's practice, the government began a campaign to marginalize and eventually eradicate Falun Gong by publishing a series of negative articles about the practice in state-run newspapers. *Id.* ¶ 41. Over the next few years, the government allegedly escalated its efforts by issuing a nationwide ban on Falun Gong literature, starting a media campaign to characterize Falun Gong as a cult whose members advocated criminal activity, and harassing, physically intimidating, detaining, and arresting practitioners without cause. *Id.* ¶¶ 41-43. In 1999, after a peaceful demonstration by Falun Gong practitioners for the release of their fellow practitioners, PRC president Jiang Zemin allegedly directed government officials to utilize the full resources of the state to eradicate the Falun Gong practice both in China and overseas. *Id.* ¶¶ 46-47. The government's efforts within China allegedly resulted in the murder of 1,500 Falun Gong practitioners, the arrest and detention of up to 50,000 practitioners, the torture of thousands of Falun Gong members, the incarceration of practitioners in labor/re-education camps and mental institutions, and the expulsion of practitioners from educational institutions and employment. *Id.* ¶¶ 49-50.

In the United States, the Chinese government allegedly engaged in many of the same tactics of threats and coercion that it used in China.  *Id.* ¶ 53.  The plaintiffs assert that in a propaganda campaign aimed at overseas Chinese residents, the Chinese government sought to use mass media outlets to disparage Falun Gong leadership and vilify Falun Gong practice.  *Id.* Toward that end, the plaintiffs contend, the Chinese government used its embassy and consulate officials to orchestrate a nationwide campaign of disinformation against Falun Gong practitioners, distributing negative programming produced in China throughout major U.S. television markets and preventing Falun Gong practitioners from having equal access to those outlets.[3]  *Id.*  In particular, the plaintiffs allege that on January 30, 2001, the government staged a limited-access news event at which several individuals identified as Falun Gong practitioners set themselves on fire in Tiananmen Square.  *Id.* ¶¶ 55, 221-23.  In February 2001, defendant CCTV promoted and distributed the television footage of the staged news event throughout the United States.  *Id.* ¶¶ 56-57.  According to the plaintiffs, the CCTV footage was accompanied by a narrative that defamed certain Falun Gong practitioners living in the United States as advocates of suicide, intra-family violence, anti-family values, and cult worship.  *Id.*  In October and November 2001, the footage was re-broadcast in the top five U.S. markets for Chinese-Americans, *id.* ¶¶ 59, 234, and in December 2001, CCTV re-broadcasted this footage as one of its top stories of 2001.  *Id.* ¶ 61.  The plaintiffs allege that ministry and embassy officials disseminated thousands of videotape copies of the footage to various federal and state officials and incorporated the contents of the footage with defamatory statements onto the Chinese

---

[3]     According to the plaintiffs, this overseas campaign also included authorization of bias-motivated crimes, such as assault and battery, destruction and theft of property, interference with communications, and orchestrated efforts to influence U.S. officials by labeling Falun Gong a cult and its practitioners as terrorists.  Am. Compl. ¶ 54.

embassy's website. *Id.* ¶¶ 62, 65, 235-36, 238. Finally, the plaintiffs assert that the officials

issued threats and took actions against U.S. city officials who proclaimed support for Falun

Gong practitioners. *Id.* ¶¶ 62-70.

### B.   Procedural Background

The plaintiffs filed their initial complaint on April 3, 2002 and an amended complaint on

July 5, 2002. In their amended complaint, the plaintiffs allege the following eleven causes of

action: (I) violations of Racketeering Influences and Corrupt Organizations ("RICO"), 28 U.S.C.

§§ 1962(c), (d), "arising out of FSIA commercial activity" for physical assault and battery while

demonstrating or handing out literature, malicious destruction of property/acts of vandalism,

threats of murder and arson, wiretapping, commission of a federal crime; (II) "FSIA 'tortious

activity' § 1605(a)(5) negligent hiring, retention, and supervision;" (III) violations of 42 U.S.C.

§§ 1983 and 1985(c)(3) of the Civil Rights act of 1871; (IV) civil conspiracy; (V) aiding and

abetting a civil conspiracy; (VI) invasion of privacy; (VII) invasion of privacy of a plaintiff;

(VIII) defamation; (IX) malicious interference with an existing contractual relationship; (X)

"District of Columbia bias-related crimes" in violation of 22 D.C. Code § 3201 *et seq*; and (XI)

aiding and abetting the commission of bias-related crimes. Am. Compl. ¶¶ 81, 105, 106, 124,

160, 171, 213, 217, 242, 249, 255.

On March 24, 2003, the court granted CCTV's motion to dismiss the plaintiffs'

defamation claim, their eighth count. Mem. Op. (March 24, 2003). On October 9, 2004, the

court granted the plaintiffs' motion for jurisdictional discovery. Mem. Op. (Oct. 24, 2004). The

Society delivered to the court its Suggestion, dated July 4, 2005, in which it argued that the court

lacks subject-matter jurisdiction over the defendants. On July 15, 2005, the plaintiffs sent the

court a letter in lieu of filing a motion to strike the Society's Suggestion.[4]

Because immunity is a positive claim, one that involves not merely a defense to liability but also a protection from suit, *see Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (citing *Prakask v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C. Cir. 1984)), the court has an obligation to consider *sua sponte* its jurisdiction over the defendant ministries and CCTV.[5]  Accordingly, the court ordered the plaintiffs to show cause why this case should not be dismissed for lack of subject-matter jurisdiction.  Order (Dec. 12, 2005).  In January 2006, the plaintiffs filed their memorandum in response to the court's order and in February the Society provided its response to the plaintiffs' response.  It is to the jurisdictional question that the court now turns.

---

[4]     The court frowns upon this type of *ex parte* communication.  LcvR 1(b) (stating that, "[e]xcept when requested by a judge, correspondence shall not be directed by the parties or their attorneys to a judge, nor shall papers be left with or mailed to a judge for filing").

[5]     The district court has a unique obligation in Foreign Sovereign Immunity Act ("FSIA") cases to determine its jurisdiction over the foreign sovereign.  *Verlinden*, 461 U.S. at 493-94 (1982).  This duty stems from the normative theory of sovereign immunity, evident in Chief Justice Marshall's opinion in *Schooner Exchange v. McFadden*, 11 U.S. (7 Cranch) 116, 134 (1812) (stating that "[s]overeigns are equals.  It is the duty of a sovereign, not to submit his rights to the decision of a *co-sovereign*.  He is the sole arbiter of his own rights.  He acknowledges no superior, but God alone.  To his equal, he shown respect, but not *submission*") (emphasis in original).  In pursuit of this jurisdictional determination, the district court has "considerable discretion in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *Prakask*, 727 F.2d at 1179.  Even if the foreign state does not enter an appearance to assert an immunity defense, a district court still must determine whether immunity is unavailable under FSIA.  *Verlinden*, 461 U.S. at 496.

### III.   ANALYSIS

#### A.   Legal Standard for Dismissal Pursuant to Rule 12(b)(1)
of the Federal Rules of Civil Procedure

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxite de Guinea*, 456 U.S. 694, 702 (1982)).  On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The court may dismiss a complaint for lack of subject-matter jurisdiction only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  Moreover, the court

is not limited to the allegations contained in the complaint.  *Hohri v. United States*, 782 F.2d

227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Instead, to determine

whether it has jurisdiction over the claim, the court may consider materials outside the pleadings.

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

### B.    Statutory Framework – Legal Standard for FSIA

FSIA is the sole basis for obtaining jurisdiction over a foreign state, state agency, or state

instrumentality in our courts.  28 U.S.C. §§ 1604, 1330(a); *Argentine Republic v. Amerada Hess

Shipping Corp.*, 488 U.S. 428, 434 (1989).[6]  The basic premise of FSIA is that foreign

sovereigns are immune from suit in the United States unless the action falls under one or more of

the nine specific exceptions enumerated in the statute.[7]  28 U.S.C. § 1604; *Saudi Arabia v.

Nelson*, 507 U.S. 349, 355 (1993); *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d

192, 196 (D.C. Cir. 2004).  If the foreign sovereign is not immune, the federal district courts

have exclusive jurisdiction over the action.  28 U.S.C. §§ 1330, 1604; *Daliberti v. Republic of

Iraq*, 97 F. Supp. 2d 38, 42 (D.D.C. 2000) (citing *Amerada Hess*, 488 U.S. at 434-35).

Under FSIA, the foreign sovereign has "immunity from trial and the attendant burdens of

---

[6]     *See also* H.R. Rep. No. 94-1487, 94th Cong., 2d Sess. (stating that FSIA provides the "sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before federal and state courts in the United States") ("House Report").  The legislature designed FSIA to accomplish four objectives: (1) to codify the "restrictive" principle of sovereign immunity, (2) to ensure that this restrictive theory is applied uniformly in litigation before U.S. courts, (3) to provide formal procedures for making service of process upon, giving notice to, and obtaining *in personum* jurisdiction over a foreign state or its instrumentalities in an action in a U.S. court, and (4) to remedy the predicament of the plaintiff who obtains judgment against a foreign state.  *Verlinden*, 461 U.S. at 496-97 (stating that FSIA is not simply a jurisdictional statute, but a codification of "the standard governing foreign sovereign immunity as an aspect of substantive federal law[]").

[7]     RESTATEMENT (SECOND) OF FOREIGN RELATIONS § 65 (1) (stating the general rule of sovereign immunity is that "a state is immune from the exercise by another state of jurisdiction to enforce rules of law").

litigation . . . not just a defense to liability on the merits." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) (quoting *Foremost-McKesson, Inc.*, 905 F.2d at 443)). The special circumstances of a foreign sovereign require the court to engage in more than the usual pretrial factual and legal determinations. *Foremost-McKesson*, 905 F.2d at 449. The D.C. Circuit has noted that it is particularly important that the court "satisfy itself of its authority to hear the case" before trial. *Id.* (quoting *Prakash*, 727 F.2d at 1179).

The plaintiff bears the burden of producing evidence to show that the foreign sovereign defendant does not enjoy immunity and that one or more of the nine exemptions to FSIA constitutes a waiver of the defendant's sovereign immunity thereby conferring federal court jurisdiction over the plaintiff's claims. 28 U.S.C. § 1602; *Daliberti*, 97 F. Supp. 2d at 42. Once the plaintiff has shown that the foreign sovereign defendant is not immune from suit, the burden shifts to the defendant to prove that the plaintiff's allegations do not bring the case within one of the statutory exceptions to immunity. *Phoenix Consulting*, 216 F.3d at 40; *Doe v. Holy See*, __F. Supp. 2d__, 2006 WL 1549406 *3 (D. Or. June 7, 2006). A court may dismiss a complaint brought under FSIA only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. *Id.*

If the sovereign makes a "conscious decision to take part in the litigation," then it must assert its immunity under the FSIA either before or in its responsive pleading. *Foremost-McKesson*, 905 F.2d at 443-45. "The nature of the court's inquiry depends on the nature of the defendant's challenge." *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123, 1127 (D.C. Cir. 2004). "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the [FSIA]

exceptions to immunity invoked by the plaintiff." *Id.* (internal quotations omitted). If, on the other hand, "the defendant challenges the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant. Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."[8] *Id.*

The exemptions to foreign sovereignty at issue in this case are the commercial activity exemption, codified at 28 U.S.C. § 1605(a)(2), and the tortious act exemption, codified at 28 U.S.C. § 1605(a)(5).

The FSIA "commercial activity" exception confers jurisdiction to U.S. courts over actions brought against foreign states and their agencies or instrumentalities when the action:

> is based upon a commercial activity carried on in the Unites States by a foreign state; or an act performed in the United States in connection with a commercial activity of a foreign state elsewhere; or an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act caused a direct effect in the United States.

28 U.S.C. § 1605(a)(2); *Republic of Arg. v. Weltover*, 504 U.S. 607, 611 (1992); *Global Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108 (D.D.C. 2003), *appeal dismissed*, 2004 WL 1368856 (D.C. Cir. Jun 17, 2004).

For a claim to be "based upon" a commercial activity, the alleged commercial activity must contain the "elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357. If a transaction is partially commercial and

---

[8]  In the instant case, the Society argues that the court lacks jurisdiction over the remaining defendants under FSIA. The court, therefore, proceeds with an analysis of the defendants' sovereign immunity, accepting the plaintiffs' factual allegations as true. *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1031-1032 (D.C. Cir. 2004) (affirming the district court's dismissal based on its consideration, *sua sponte*, of the applicability of FSIA and its exceptions).

partially sovereign in nature and the cause of action is based on sovereign activities involved in the transaction, the commercial activity exception to FSIA does not apply and the sovereign is immune from suit. 28 U.S.C. §§ 1603(a)(2), 1604; *Millen Indus., Inc. v. Coordination Council for N. Am. Affairs*, 855 F.2d 879, 885 (D.C. Cir. 1988) (holding that a cause of action against Taiwanese instrumentalities arising from alleged breaches of Taiwanese law involved sovereign aspects of a commercial transactions which fall outside of the commercial activities exemption to FSIA). If, on the other hand, the cause of action is based on the commercial activities, the foreign sovereign is not immune. *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 167 (D.C. Cir. 1994).

FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Courts determine the commercial character of an activity "by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.*; *Weltover*, 504 U.S. at 614 (holding that courts must examine whether the foreign state's actions are the type of action by which a private party engages in trade, traffic, or commerce, rather than whether the foreign government is acting with a profit motive or with the aim of fulfilling uniquely sovereign objectives); *Nelson*, 507 U.S. at 359-61 (reasoning that if a claim rests entirely upon activity "peculiarly sovereign in nature," jurisdiction will not exist under the commercial activity exception of FSIA); *see also Cicippio*, 30 F.3d 164 (holding that acts of hostage-taking, assassination, extortion, blackmail, and kidnaping for economic advantage are not commercial activities under FSIA).

The "direct effect" of a commercial activity in the United States must be nontrivial, although the effect does not have to be substantial or foreseeable. *Weltover*, 504 U.S. at 617-

11

618.  An effect is direct "if it follows as an immediate consequence of the defendant's

activities," *id*., at 618 (internal quotation marks omitted), and if there is no intervening element,

*Upton v. Empire of Iran*; 459 F. Supp. 264, 266 (D.D.C. 1978), *aff'd*, 607 F.2d 494 (D.C. Cir.

1979)).  In determining where the effect is directly felt, courts look to the place where legally

significant acts giving rise to the claim occurred rather than to where merely incidental or

eventual effects are felt.  *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir.

1988).

      The tortious act or omission exemption to sovereign immunity, 28 U.S.C. § 1605(a)(5),

deprives a foreign state of sovereign immunity in legal actions "in which money damages are

sought against [it] for personal injury . . . caused by the tortious act or omission of that foreign

state or of any official or employee of that foreign state while acting within the scope of his

office or employment" provided that the claim is not "based upon the exercise or performance or

the failure to exercise or perform a discretionary function regardless of whether the discretion be

abused."  28 U.S.C. § 1605(a)(5).  In assessing whether the tortious act or omission exemption

applies, the court must first determine whether the alleged acts constitute tortious acts and

second, whether the defendant actors committed those tortious acts while acting within the scope

of their employment.  *Id.*

      Under FSIA, "the foreign state shall be liable in the same manner and to the same extent

as a private individual under like circumstances."  28 U.S.C. § 1606.  As such, "[w]here state

law provides a rule of liability governing private individuals, the FSIA requires the application

of that rule to foreign states in like circumstances."  *First Nat'l City Bank v. Banco Para El*

*Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983); *see Dammarell v. Islamic Republic*

*of Iran*, 2005 WL 756090 * 8 (D.D.C. March 29, 2005) (characterizing § 1606 as a jurisdictional

pass-through to traditional causes of action available to plaintiffs against private actors).

If the alleged tortious activities could not render the foreign sovereign liable for a tort under the applicable law, then the sovereign remains immune under § 1605(a)(5).  If the district court concludes that the plaintiff succeeded in alleging that the foreign sovereign action constituted tortious acts under the applicable law, the court must then decide whether those acts were discretionary.  28 U.S.C. § 1605(a)(5); *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987).  If discretionary, the sovereign remains immune from the lawsuit.  *Id.*

> **C.    Claims II and IX State Claims Which Waive Sovereign Immunity Under FSIA; The Court Dismisses the Remaining Claims**

> **1.    Claims II and IX are Based on Commercial Activity**

The plaintiffs allege facts which, if established, are sufficient to deprive the defendants of immunity under the commercial activity exception of FSIA in claims II and IX. The plaintiffs allege in claim II that the defendant ministries "hired various John Doe [t]hugs . . . with a view towards intimidating the Plaintiffs and injuring them in their personal lives, careers and business pursuits."  Compl. ¶¶ 104-105.  As a result, the plaintiffs allege, they "suffered severe bodily injuries in certain instances, were threatened with arson and murder, were victims of arson, had their living quarters burglarized and, through various invasions of privacy, have

had their once peaceful family lives shattered."[9]  *Id.*  ¶ 109.

FSIA requires a court to look at the nature of an activity, not the purpose of the activity, when assessing a foreign sovereign's liability under FSIA in performance of partially commercial and sovereign activities.  *Weltover*, 504 U.S. at 612-13.  The plaintiffs allege that the defendant ministries hired the John Doe thugs with the intention of harassing and battering the plaintiffs.  Compl. ¶ 104-105.  The court has no information showing that these alleged actions constitute uniquely sovereign functions.  Until the defendant provides some countervailing evidence or argument indicating that this alleged commercial act (the negligent hiring of dangerous thugs) is subsumed within sovereign immunity, the court rules that it is not.  *Phoenix Consulting*, 216 F.3d at 40 (stating that "the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity").

In claim IX, the plaintiffs allege that the defendant ministries and CCTV interfered with their existing contractual relationship with Channel 56, Fairfax, Virginia, by offering the owner of Channel 56, Fairfax, Virginia, various commercial incentives to sever its broadcast contract

---

[9]        The court notes the generalized and conclusory nature of the plaintiffs' allegations.  The plaintiffs do allege specific acts in a lengthy chart beginning on page 19 of their amended complaint. Am. Compl. at 19-25.  These incidences, however, describe events in which the plaintiffs were victimized, but they are conspicuously silent as to the perpetrators of these actions.  Instead, the plaintiffs chose to phrase their allegations, for the most part, in the passive voice to avoid indication of the alleged actor.  *Id.* (*e.g.*, stating that Falun Gong members "were physically assaulted," and that "[p]laintiff FANG's cassette player in his car was destroyed").  And when the plaintiffs do indicate an actor or actors, they reference them in extremely broad language with no necessary ties to government action. Id. (*e.g.*, stating that the plaintiffs were victimized by a "crowd of Chinese men," "a mob of thugs," "a group of angry [People's Republic of China] supporters," "Defendant John Doe Thugs," "a Chinese male holding a bolt cutter," "three men," "Chinese individuals," "a Chinese man," and best of all, "an unknown individual").

The court wonders how the plaintiffs plan to support these allegations, perhaps by deposing the "unknown individual," and waits with baited breadth to review the transcript.  The court notes, however, that the defendants have not yet filed a motion for summary judgment, and as such, the court need not now consider the vagaries which permeate the amended complaint.

14

with Falun Gong practitioners.  Compl. ¶¶ 240-247.  In offering commercial incentives to the owners of the broadcasting company, the defendant ministries acted like a private actor, and when a foreign sovereign's activity are like those undertaken by private actors, it is "commercial" in nature.  *Weltover*, 504 U.S. at 612-13.  The alleged attempts to interfere with the plaintiffs' contract strips the defendants of immunity under FSIA because an individual, acting in their private capacity, could interfere with a contractual relationship between another individual licensee and the licensor broadcaster.  *Id.*; *see also, Cicippio*, 30 F.3d at 166-167.

### 2. The Plaintiffs' Remaining Claims Do Not Constitute Commercial Activity Within the Meaning of FSIA

Aside from claims II and IX, the plaintiffs fail to allege facts sufficient to deprive the defendant ministries and CCTV of immunity under the commercial activity exception of FSIA. Rather then alleging activities that have indicia of commerce within the meaning of FSIA, the plaintiffs allege acts akin to abuses of state power.  These types of actions, however, do not undermine the state's sovereign immunity, regardless of how barbarous the state action.  *Nelson*, 507 U.S. 349 at 361 (stating that allegations of wrongful arrest, imprisonment, and torture "could not qualify as commercial [because this action] boils down to abuse of the power of its police"). "[H]owever monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood . . . as peculiarly sovereign in nature." *Id.*

In claim I, for example, the plaintiffs allege that the defendant ministries engaged in a pattern of racketeering activity by ordering embassy and consulate personnel to "line up and/or enlist services and assistance of various thugs . . . with a view towards being able to target [Falun Gong] practitioners as victims of bias related criminal acts." Am. Compl. ¶ 88.  In claim III, the plaintiffs allege that the defendant ministries developed a plan to eradicate the Falun Gong in

15

America, which had the effect of abridging and nullifying the plaintiffs fundamental human rights, privileges and immunities that they are entitled to as United States citizens. Am. Compl. ¶¶ 121-158. Also in claim III, the plaintiffs allege that the defendant ministries denied a plaintiff entry to China to punish her for attending Falun Gong events, Am. Compl. ¶ 148, and mailed fabricated news stories of incidences of self-immolation by Falun Gong practitioners to various United States city mayors, Am. Compl. ¶ 130. In claim IV, the plaintiffs allege that the defendants directed personnel to defame the plaintiffs. Am. Compl. ¶ 85.

From the plaintiffs' allegations, the court is confident that the alleged activities do not constitute activities in which a private person could engage. *Nelson*, 507 U.S. at 357. It is simply not feasible for a private actor to abridge civil rights in the ways alleged by the plaintiffs. *Cicippio*, 30 F.3d at 167 (citing *Nelson* for the proposition that private parties cannot exercise this "'sort of power' while engaging in commerce"). The plaintiffs' allegations do not amount to a type of action "typically performed by participants in the market." *Mwani v. Bin Laden*, 417 F.3d 1, 16-17 (D.C. Cir. 2005) (noting that "[e]xercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce. Such acts as legislation, or the expulsion of an alien, or a denial of justice, cannot be performed by an individual acting in his own name. They can be performed only by the state acting as such") (internal citations omitted).

Here, the plaintiffs allege that the defendant ministries directed their U.S. embassies and consular offices to monitor the U.S. mail, covertly intercept and record private conversations, conduct surveillance of the plaintiffs' conversations, and photograph and video-tape members of the Falun Gong. *See, e.g.,* Compl. ¶ 147, 148. Numerous times in the amended complaint, the plaintiffs complain of incidences in which they were refused entry into China, allegedly because

16

of their affiliations with Falun Gong.  *See, e.g.*, Compl. ¶¶ 148, 150, 153, 154, 157.  For

example, plaintiff Martin, "was trying to enter China at Shanghai airport on a valid business visa

that she had obtained [but to] punish her from attending Falun Gong events, she was denied

entry into China and immediately sent home."[10]  Compl. ¶ 148.  Though not as monstrous as the

instances of torture or incarceration, the exercise of such actions are similarly "sovereign in

nature and do[] not come within the commercial activities exception of the FSIA."  *Bao Ge v. Ki

Peng*, 201 F. Supp. 2d 14, 24 (D.D.C. 2000), *aff'd* 35 Fed. Appx. 1 (D.C. Cir. 2002) (concluding

that the Chinese government's incarceration and mistreatment of workers required to perform

forced labor in manufacturing soccer balls for the American market, arose out of an abuse of

China's police power, and as such, could not be considered commercial); *see also Nelson*, 507

U.S. at 361 (ruling that Saudi Arabia's wrongful arrest, incarceration, and torture of an American

national working for a Saudi Arabian hospital could not be considered commercial activity for

purposes of the commercial activity exception to FSIA although it did constitute an abuse of

police power).  The plaintiffs allege no commercial activities by the defendant ministries or

CCTV within the meaning of FSIA to give rise to the plaintiffs' remaining causes of action.[11]

### 3.   The Plaintiffs' Remaining Claims Do Not Arise Out of Non-Commercial Tortious Activity

In addition to the commercial activity exception to FSIA, the plaintiffs invoke the

tortious activity exception of FSIA as an independent basis for waiver of the defendants'

---

[10]   The People's Republic of China, as a sovereign, enjoys an "overriding power and responsibility . . . to police the national borders."  *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001).  Aside from analyzing the defendants' sovereign immunity, the court doubts its institutional competence to assess the lawfulness of China's border security policies.

[11]   Having concluded that plaintiffs do not allege commercial activities, the court need not proceed to prong two: assessing whether there is a sufficient "jurisdictional nexus" between the activity alleged and the causes of action.  *See Weltover*, 504 U.S. at 611.

sovereign immunity.  Specifically, the plaintiffs allege that the defendants hired various "John

Doe Thugs" to injure and intimidate the plaintiffs.  Am. Compl. ¶¶ 104, 105.  The plaintiffs

allege that the defendant ministries "failed to properly oversee these thugs to ensure that they did

not engage in overt criminal conduct" and "failed to interview and thoroughly investigate these

persons."  *Id.* ¶¶ 107, 108.  The injuries allegedly suffered by the plaintiffs as a result of the

defendants' alleged negligence in its personnel decisions regarding its employee "thugs" include

physical and mental intimidation, loss of privacy, and damage to personal property for

"exercising . . . constitutional rights and liberties."  *Id.* ¶¶ 110-113.

 The defendant ministries' and CCTV's actions constitute "discretionary functions" and,

thus, fall outside the tortious act exception to FSIA immunity.  Although cast in general terms,

Congress created the "tortious act" exception primarily to remove immunity for cases arising

from traffic accidents.  *See, e.g., Asociacion de Reclamantes v. United Mexican States,* 735 F.2d

1517, 1525 (D.C. Cir.1984), *cert. denied,* 470 U.S. 1051, (1985).  "This is scarcely to say that

the exception applies only to traffic accidents . . . the point is that the legislative history counsels

that the exception should be narrowly construed so as not to encompass the farthest reaches of

common law."  *MacArthur Area Citizens Ass'n*, 809 F.2d at 921.

 Given the exception's limited breadth, the defendants' alleged actions in this case fall

outside of FSIA's tortious act exception.  The defendants' human-resource decisions regarding

its thugs (*e.g.*, hiring, training, and supervising), Compl. ¶¶ 107, 108, clearly "involve a measure

of policy judgment."  *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1196

(D.C. Cir. 1986) (ruling that decision makers involved in implementation are immune "if they

must exercise such [policy] judgments too"); *see United States v. S.A. Empresa de Viacao Aerea

Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984) (ruling that the discretionary function

exception precluded tort action based upon the Federal Aviation Administration's alleged

negligence for failing to check certain specific facts in the course of certifying certain aircraft for

commercial use).  For these reasons, the court rules that the plaintiffs allege no tortious activity

by the defendant ministries or CCTV within the meaning of FSIA to give rise to the plaintiffs'

remaining causes of action.


## IV.   CONCLUSION

For the foregoing reasons, the court preserves the plaintiffs' causes of action II and IX

against the defendant ministries and *sua sponte* dismisses the remaining claims.  An order

directing the parties in the manner consistent with this Memorandum Opinion is separately and

contemporaneously issued this 1st day of March, 2007.


                                         RICARDO M. URBINA
                                         United States District Judge