# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YOUMING JIN *et al.*,              :
                                    :
               Plaintiffs,        :     Civil Action No.:     02-0627 (RMU)
                                    :
               v.              :     Document Nos.:     83, 86
                                    :
MINISTRY OF STATE SECURITY *et al* ., :
                                    :
               Defendants.     :

## MEMORANDUM OPINION

### DENYING THE PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT;
### GRANTING MOTION FOR LEAVE TO FILE AMICUS CURIAE;
### DISMISSING THE PLAINTIFFS' CLAIMS FOR LACK OF SUBJECT-MATTER JURISDICTION

## I. INTRODUCTION

This case arises under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.* The plaintiffs – 51 Falun Gong[1] practitioners who are visiting Chinese nationals, U.S. residents and U.S. citizens – filed a complaint alleging violations of their rights under the Constitution and federal and state law by persons and entities associated with the People's Republic of China ("China"). The defendants – the Chinese Ministry of State Security and the Chinese Ministry of Public Security (collectively, "defendant ministries") and the Chinese national broadcasting entity China Central Television ("CCTV") – have abstained from entering into this suit, having filed no answer or response to the plaintiffs' original or amended complaints.

---

[1]    Falun Gong is a "very popular form of qigong (the general term used to describe several different organized practices of exercise and meditation)." Compl. ¶ 37. "Falun Gong distinguishes itself from other such practices by emphasizing not only physical growth but also development of one's moral character by adherence to the basic principles in daily living of Truthfulness, Compassion, and Forbearance." *Id.*

Consequently, this matter is presently before the court on the plaintiffs' motion for final default judgment against the defendants on Counts II and IX of the plaintiffs' amended complaint. The court previously declined to dismiss this complaint on a suggestion that the court lacks subject-matter jurisdiction over the defendants on the basis of alleged commercial activity within the meaning of FSIA. But, on default judgment, the plaintiffs do not provide evidence sufficient to establish that the court has jurisdiction over their negligent hiring-and-supervision claim. And, while the court concludes it does have jurisdiction over their claim of contractual interference, because the plaintiffs fail to provide legally sufficient evidence establishing that claim, the court dismisses it and denies their motion for default judgment.

## II.  BACKGROUND

### A.  Factual History

The plaintiffs all practice Falun Gong, a self-improvement practice or discipline similar to Tai Chi that has its roots in ancient Chinese culture. Am. Compl. ¶ 36. According to the plaintiffs, Falun Gong was initially well received in China for its health benefits, obtaining numerous awards and counting many government officials and senior Communist Party members among its practitioners. *Id.* ¶ 38. The Chinese government subsequently began to perceive the spectacular growth of Falun Gong as a threat to state security, national stability and economic development. *Id.* ¶¶ 39-40. In 1996, after the government's limited success in early efforts to control Falun Gong's practice, the government began a campaign to marginalize and eventually eradicate Falun Gong. *Id.* ¶ 41. Over the next few years, the government allegedly escalated its efforts by issuing a nationwide ban on Falun Gong literature, starting a media campaign to

characterize Falun Gong as a cult whose members advocated criminal activity, and harassing, physically intimidating, detaining and arresting practitioners without cause. *Id.* ¶¶ 41-43.  In 1999, after a peaceful demonstration by Falun Gong practitioners for the release of their fellow practitioners, China's president Jiang Zemin allegedly directed government officials to utilize the full resources of the state to eradicate the Falun Gong practice both in China and overseas. *Id.* ¶¶ 46-47.  The government's efforts within China allegedly resulted in the murder of 1,500 Falun Gong practitioners, the arrest and detention of up to 50,000 practitioners, the torture of thousands of Falun Gong members, the incarceration of practitioners in labor/re-education camps and mental institutions, and the expulsion of practitioners from educational institutions and employment. *Id.* ¶¶ 49-50.

In the United States, the Chinese government allegedly engaged in many of the same tactics of threats and coercion that it used in China. *Id.* ¶ 53.  The plaintiffs assert that the defendants hired various "John Doe Thugs" in New York City, Washington, D.C., Chicago, San Francisco and Los Angeles, "with a view towards intimidating the plaintiffs and injuring them in their personal lives, careers and business pursuits." *Id.* ¶¶ 104-105.  The plaintiffs contend that the defendant ministries directed consulate officials to hire these thugs and "ordered [them] to ignore any proclivity [the thugs] might have for inflicting bodily harm or other damage on Falun Gong practitioners.  The negligent hiring allegedly posed a threat of real physical harm, i.e., arson or several physical beatings." *Id.* ¶ 106.  Additionally, the plaintiffs allege that "Embassy based personnel" have offered commercial incentives to Mike Liu, the owner of Channel 56, W.C.T.V. in Fairfax, Virginia, in a continuing effort to impair the existing contractual relationship between the plaintiffs and Channel 56. *Id.* ¶ 247.  They contend that this effort to

interfere with their "contract with Channel 56" was directed by the defendant ministries.  *Id*. ¶ 245.

### B.  Procedural History

The plaintiffs filed their initial complaint on April 3, 2002 and an amended complaint on July 5, 2002.  In their amended complaint, the plaintiffs allege eleven causes of action based on either a commercial activity or a non-discretionary tort activity within the meaning of FSIA.  On March 24, 2003, the court granted CCTV's motion to dismiss the plaintiffs' defamation claim, their eighth count.  Mem. Op. (Mar. 24, 2003).  On October 9, 2004, the court granted the plaintiffs' motion for jurisdictional discovery.  Mem. Op. (Oct. 24, 2004).  The Chinese Society of Private International Law ("Society") delivered to the court its Suggestion, dated July 4, 2005, in which it argued that the court lacks subject-matter jurisdiction over the defendants.  On July 15, 2005, the plaintiffs sent the court a letter in lieu of filing a motion to strike the Society's Suggestion.  On November 14, 2005, the District Court Deputy Clerk entered default against the defendants because they failed to make an appearance or respond to this action.

On December 12, 2005, the court ordered the plaintiffs to show cause why this case should not be dismissed for lack of subject-matter jurisdiction.  Order (Dec. 12, 2005).  In January 2006, the plaintiffs filed their memorandum in response to the court's order and in February the Society provided a renewed Suggestion.[2]  On March 1, 2007, the court issued an opinion based on its initial consideration of subject-matter jurisdiction, preserving claims (II) "FSIA 'tortious activity' § 1605(a)(5) negligent hiring, retention, and supervision" and (IX)

---

2       In its initial consideration of its jurisdiction, the court construed the Chinese Society of Private International Law's ("Society") previous Suggestion and Renewed Suggestion as amicus curiae briefs in support of dismissal after providing the plaintiffs an opportunity to respond.  Mem. Op. (Mar. 1, 2007) at 2 n.2.

"malicious interference with an existing contractual relationship" of the plaintiffs' amended complaint.  The court determined that the plaintiffs alleged facts that, if established, were sufficient to deprive the defendants of immunity under the commercial activity exception of FSIA.  Mem. Op. (Mar. 1, 2007) at 13.

On November 20, 2007, the plaintiffs filed a motion for final default judgment.  ("Pls.' Mot. for Def. J.").[3]  On February 12, 2008, the Society moved for leave to file an amicus curiae brief ("Society's Mot. for Leave to File") and simultaneously filed an amicus curiae brief ("Society's Amicus Brief") suggesting under Federal Rule of Civil Procedure 12(h)(3) that the court lacked subject-matter jurisdiction over the case.  On March 3, 2008, the plaintiffs filed a opposition to both the Society's filings ("Pls.' Opp'n"), and on March 7, 2008 the Society filed a reply to Pls.' Opp'n ("Society's Reply").

## III.  ANALYSIS

### A.  Legal Standard for Filing Amicus Curiae Briefs

"An amicus curiae, defined as 'friend of the court,' . . . does not represent the parties but participates only for the benefit of the Court."  *United States v. Microsoft Corp.*, 2002 WL 319366, at *2 (D.D.C. 2002).  "District courts have inherent authority to appoint or deny *amici* which is derived from Rule 29 of the Federal Rules of Appellate Procedure."  *Smith v. Chrysler Fin. Co., L.L.C.*, 2003 WL 328719, at *8 (D.N.J. Jan. 15, 2003); *see also Sierra Club v. Fed.*

---

[3]    Although the plaintiffs maintain that they are prepared to testify at an evidentiary hearing to assess damages pursuant to the court's finding of liability, they attach three exhibits in support of their motion for final default judgment.  Exhibit 1 supports Claim II and includes approximately 50 signed affidavits and a "Negligent Hiring Damages Chart"; Exhibit 2, also in support of Claim II, is an expert report submitted by Terri E. Marsh; Exhibit 3 supports Claim IX and includes a "Summary of Damages."

*Emergency Mgmt. Agency*, 2007 WL 3472851, at *3 (S.D. Tex. Nov. 14, 2007) (finding no statute, rule or controlling case defines a federal district court's power to grant or deny leave to file amicus brief).  It is solely within the court's discretion to determine "the fact, extent, and manner" of the participation.  *Cobell v. Norton*, 246 F. Supp. 2d 59, 62 (D.D.C. 2003).  While no rule requires that an amicus be impartial, the court does consider the presence of partiality with regard to an amici's admittance.  *Smith*, 2003 WL 328719, at *8.  The extent to which district courts will permit the participation of a patently partisan amicus varies.  *Sierra Club*, 2007 WL 3472851, at *3 (denying leave to file where amicus sought to litigate fact issues and its interests and policy objectives were identical to those of the party whose position it sought to support).

> An *amicus* brief should normally be allowed when a party is not represented competently or is not represented at all, when the *amicus* has an interest in some other case that may be affected by the decision in the present case (though not enough affected to entitle the *amicus* to intervene and become a party in the present case), or when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.  Otherwise, leave to file an *amicus curiae* brief should be denied.

*Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1064 (7th Cir. 1997)).

"When a party objects to filing by a private amicus and leave of court is sought, Rule 29(b) provides that the motion for leave to file must be accompanied by the proposed brief and must state: (1) the movant's interest; and (2) the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case."  *Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 130-31 (3d Cir. 2002) (rejecting appellant's argument that an *amicus* must be an impartial person not motivated by pecuniary concerns).

### The Court Grants the Society Leave to File an Amicus Curiae Brief

In its motion for leave to file, the Society asserts that its reason for participating in this

case is based on its interest in the "law and theory of foreign sovereign immunity and also in the furtherance of amicable relations between China and the United States." Society's Mot. for Leave to File.[4] The plaintiffs, in their opposition, argue that according to Federal Rules of Civil Procedure 11(a) and 7(a)-(b), the motion for leave must be denied. Pls.' Opp'n to File Leave at 1. The plaintiffs further contend that the Society is not an "interested party"and therefore, "does not have standing to do more than bring the question of jurisdiction to the attention of the Court."[5] *Id*. at 5. In addition, the plaintiffs oppose this motion because it maintains that this is a tactical ploy on behalf of the defendants to use the Society's brief as "a surrogate to justify its failure to litigate this matter" and if this court granted leave, "it would send a chilling message that a country can avoid international justice by simply abstaining from the contest." *Id*. at 2.

The court has an obligation to determine, *sua sponte,* its jurisdiction over the defendant ministries and CCTV, and in its preliminary consideration the court adopted both of the Society's suggestions as amicus in support of dismissing this case. Mem. Op. (Mar. 1, 2007) at 2 n.2. Because the issues of jurisdiction and liability are closely related and the characterization of the alleged activities as either commercial or uniquely sovereign is unclear, this amicus brief is

---

4    Because the Society's motion for leave to file and its amicus brief were submitted without page numbers, the court will refer to them respectively as separately paginated.

5    This portion of the plaintiffs' opposition is entirely misplaced. The plaintiffs correctly acknowledge that the Society is a non-party to this suit but then challenge its motion because it fails to comply with the rules of procedure applicable to the parties. However, permitting an amicus curiae to file a brief is within the sole discretion of the judge. *Smith v. Chrysler Fin. Co., L.L.C.*, 2003 WL 328719, at *8 (D.N.J. Jan. 15, 2003). As this court previously held, "the district court has a unique obligation in Foreign Sovereign Immunity Act ("FSIA") cases to determine its jurisdiction over the foreign sovereign. *Verlinden*, 461 U.S. at 493-94 (1982)). In pursuit of this jurisdictional determination, the district court has "considerable discretion in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *Prakask v. American Univ.*, 727 F.2d 1174,1179 (D.C. Cir. 1984). Even if the foreign state does not enter an appearance to assert an immunity defense, a district court still must determine whether immunity is unavailable under FSIA. *Verlinden*, 461 U.S. at 496; Mem. Op. (Mar. 1. 2007) at 6 n.5.

desirable in order to reconcile these significant legal issues.[6]

### B. Statutory Framework - Legal Standard for FSIA

FSIA is the sole basis for obtaining jurisdiction over a foreign state, state agency, or state instrumentality in our courts.  28 U.S.C. §§ 1604, 1330(a); *Argentina Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  "Under the Act, a foreign state is presumptively immune from jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."  *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 22 (D.D.C. 2007) (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)).  Under FSIA the foreign sovereign has "immunity from trial and the attendant burdens of litigation . . . not just a defense to liability on the merits."  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) (quoting *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990)).  "In order to preserve full scope of sovereign immunity, the district court must make critical preliminary determinations of its own jurisdiction as early in litigation against a foreign sovereign as possible.  *Kilburn v. Socialist People's Libyan Arab*, 376 F.3d 1123, 1127 (D.C. Cir. 2004) (citing *Phoenix Consulting,* 216 F.3d at 39).  The special circumstances of a foreign sovereign require the court to engage in more than the usual pretrial factual and legal determinations.  *Foremost-McKesson*, 905 F.2d at 449 (D.C. Cir. 1990).  The D.C. Circuit has noted that it is particularly important that the court "satisfy itself of its authority to hear the case" before trial.  *Id.* (quoting *Prakask v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C. Cir. 1984)).

---

6       Although this court permits the participation of the Society as amicus, it acknowledges its highly partisan position.

### 1.  Evidentiary Standard for a Default Judgment on an FSIA Claim

The FSIA sets the same evidentiary standard for default judgments against foreign-state defendants as against the United States itself as a defendant, to wit: "No judgment by default shall be entered . . . against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." *Compare* 28 U.S.C. § 1608(e) *with* FED. R. CIV. P. 55(d); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003).  In evaluating the plaintiff's proof, a court contemplating the entry of a default judgment may accept as true the plaintiff's uncontroverted evidence, which may take the form of affidavits.  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006).  A flexible approach has been utilized in determining what procedures the court should employ in determining whether Rule 55(d)'s requirement of evidence satisfactory to the court is fulfilled.  The court in *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir.1994), held that:

> While in some cases [Rule 55(d)] will require a hearing, we have held that Rule 55[(d)] does not "require an evidentiary hearing if one would ordinarily not have been held, nor [does the Rule] require the court to demand more or different evidence than it would ordinarily receive in order to make its decision."

*Rafidain Bank*, 15 F.3d at 242 (quoting *Marziliano v. Heckler*, 728 F.2d 151, 158 (2d Cir. 1984)).  To ultimately succeed on a motion for default judgment on a FSIA claim, the plaintiff must present "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 224 (S.D.N.Y. 2003).

## 2. The Commercial Activity Exemption

The exemption to immunity at issue in this case is the commercial activity exemption, codified at 28 U.S.C. § 1605(a)(2).  The FSIA "commercial activity" exemption confers jurisdiction to U.S. courts over actions brought against foreign states and their agencies or instrumentalities when the action:

> Is based upon a commercial activity carried on in the United States by a foreign state; or an act performed in the United States in connection with a commercial activity of a foreign state elsewhere; or an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act caused a direct effect in the United States.

28 U.S.C. § 1605(a)(2); *Republic of Arg. v. Weltover*, 504 U.S. 607, 611 (1992); *Global Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108 (D.D.C. 2003), *appeal dismissed*, 2004 WL 1368856 (D.C. Cir. June 17, 2004).

As the Supreme Court explained in *Saudi Arabia*, the phrase, "based upon" in § 1605(a)(2) "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Agrocomplect, AD*, 524 F. Supp. 2d at 28 (citing *Saudi Arabia,* 507 U.S. at 357)).  If a transaction is partially commercial and partially sovereign in nature and the cause of action is based on sovereign activities involved in the transaction, the commercial activity exception to FSIA does not apply and the sovereign is immune from suit.  28 U.S.C. §§ 1603(a)(2), 1604; *Millen Indus., Inc. v. Coordination Council for N. Am. Affairs*, 855 F.2d 879, 885 (D.C. Cir. 1988) (holding that a cause of action against Taiwanese instrumentalities arising from alleged breaches of Taiwanese law involved sovereign aspects of a commercial transactions which fall outside of the commercial activities exemption to FSIA).  If, on the other hand, the cause of action is based on the commercial activities, the

10

foreign sovereign is not immune.  *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 167 (D.C. Cir. 1994).

FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  Courts determine the commercial character of an activity "by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  *Id.*; *Weltover*, 504 U.S. at 614 (holding that courts must examine whether the foreign state's actions are the type of action by which a private party engages in trade, traffic, or commerce, rather than whether the foreign government is acting with a profit motive or with the aim of fulfilling uniquely sovereign objectives); *Saudi Arabia*, 507 U.S. at 359-61 (reasoning that if a claim rests entirely upon activity "peculiarly sovereign in nature," jurisdiction will not exist under the commercial activity exception of FSIA); *see also Cicippio*, 30 F.3d 164 (holding that acts of hostage-taking, assassination, extortion, blackmail, and kidnaping for economic advantage are not commercial activities under FSIA).

## C.  The Plaintiffs Fail to Provide Sufficient Evidence to Waive Immunity Under FSIA

This court initially preserved two of the plaintiffs' eleven claims arising under the FSIA § 1605(a)(2) commercial activities exception.  Mem. Op. (Mar. 1, 2007).  The plaintiffs subsequently filed a motion for final default judgment based on the existing allegations and additional evidence offered through exhibits that purport to establish liability and damages. However, the plaintiffs do not substantiate their general and conclusory allegations positing subject-matter jurisdiction.  Therefore, after reconsideration, *sua sponte*, of this court's subject matter jurisdiction, the court finds that the plaintiff's allegations and supporting documents, even

if taken as true, do not satisfy the commercial activities exception found in §1605(a)(2).

**1. Claim II Does Not Constitute Commercial Activity Within the Meaning of FSIA**

In Claim II of the plaintiffs' amended complaint, "FSIA 'Tortious Activity' § 1605(a)(5) Negligent Hiring, Retention and Supervision," the plaintiffs allege that the defendant ministries hired "John Doe thugs" with the intention of harassing and battering the plaintiffs.  Am. Compl. ¶¶ 104-105.  When the court upheld this claim it highlighted the "generalized and conclusory nature of the plaintiffs' allegations."  Mem. Op. (Mar. 1, 2007) at 14 n.9.  Because the plaintiffs have not substantiated their jurisdictional claims, the court cannot conclude that the defendants' activities alleged in Claim II constitute commercial activities for purposes of waiving immunity under FSIA.  Therefore, the court dismisses this claim for want of subject-matter jurisdiction.

The plaintiffs contend that the Chinese government, through its chain of command, used the defendant ministries, embassy and consulate officials to solicit local "Chinese Association" community support including the retention of "thugs," as either agents or employees, hired in part to encourage the defamation and "tit-for-tat struggles against local overseas Falun Gong." Pl.s' Mot. for Def. Judg., Ex. 2 (expert report submitted by Terri E. Marsh) at 13.  It is this alleged "hiring," albeit "negligent," that the plaintiffs rely on to demonstrate a commercial activity for purposes of establishing jurisdiction under FSIA.  "A foreign state, Congress anticipated, would be answerable in court, just as a private party is, when it acts in an essentially private rather than sovereign capacity."  *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1550 (D.C. Cir. 1987).  The Society argues that because the alleged activities are noncommercial, the hiring to do such acts does not take place in a commercial context.  Society's Amicus Brief at 3-4 (citing *Cicippio*, 30 F.3d at 168) (determining that a sovereign's alleged use

of non-official agents to engage in intentional non-commercial acts must take place in a commercial context to determine whether it is conducted in the manner of a private player in the market) and *El-Hadad v. United Arab Emirates*, 496 F.3d 658 (D.C. Cir. 2007) (analyzing commercial activity exception as applied in the employment context and adopting a two-step approach to determining whether the plaintiff's foreign government employment was commercial rather than governmental)).

While the plaintiffs provide no evidence beyond the allegation that "thugs" were retained from the community and hired "with a view towards intimidating" the plaintiffs, Am. Comp. ¶ 105, the question remains whether their "hiring" constitutes a commercial activity. *El-Hadad*, 496 F.3d at 664 (determining that although plaintiff is not a civil servant the court must still scrutinize whether his work involves the exercise of "powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns"). In reviewing this claim, the court will not render the mere act of "hiring" of non-civil servants a commercial activity without considering the broader political context of these allegations. *Weltover*, 504 U.S. at 616 (considering the full context of the transaction in order to determine whether it is "commercial").

The defendant ministries are the alleged perpetrators responsible for hiring "thugs" to implement China's policy of eradicating Falun Gong. Hiring persons to physically harass and intimidate individuals – to commit intentional torts of battery and assault against a predetermined victim – does not involve the exercise of a "power[] that can also be exercised by private citizens, as distinct from those powers peculiar to sovereign." *El-Hadad*, 496 F.3d at 664. No private citizen has the authority to engage in such behavior as a routine, legitimate way of participating in the market. *See Weltover*, 504 U.S. at 614 (holding that courts must examine

whether the foreign state's actions are the type of action by which a private party engages in trade, traffic, or commerce, rather than whether the foreign government is acting with a profit motive or with the aim of fulfilling uniquely sovereign objectives); *see also Cicippio*, 30 F.3d 164 (holding that acts of hostage-taking, assassination, extortion, blackmail, and kidnaping for economic advantage are not commercial activities under FSIA). Moreover, although the hiring of the thugs necessarily partakes of contractual elements, such as the exchange of consideration (remuneration for violence), the plaintiffs identify no hidden or implicitly commercial component to the Chinese government's hiring of thugs to implement its policy of suppressing Falun Gong as a cult. *Cf. Saudi Arabia*, 507 U.S. 349 (1993) (contemplating the broader commercial context of the government hiring the plaintiff to run a hospital). The defendant ministries' mandate to implement China's policy and its authority to hire "thugs" is not of the nature that may be exercised by private citizens participating in the marketplace, excepting those residing in Hobbes's state of nature. THOMAS HOBBES, *Leviathan* 89 (Richard Tuck ed., 1991) (describing life in such a state in which individuals retain the police power as "nasty, brutish, and short"); *El Hadad*, 496 F.3d 658 at 667 (citing *Saudi Arabia*, 507 U.S. at 360). This is the exercise of the quintessential police power held by the State in its "monopoly of violence." MAX WEBER, *Politics as a Vocation* (1919) (Rodney Livingstone trans., Hackett 2004) (defining a "state" as an institution that exercises a "monopoly of violence" within a given territory).

The fact that the plaintiffs characterize the nature of these activities as "tortious," further indicates that the commercial activities exception does not appropriately apply. *Saudi Arabia,* 507 U.S. at 349 (reasoning that "[w]hile these arguably commercial activities may have led to the commission of the torts that allegedly injured the Nelsons, it is only those torts upon which their

action is 'based' for purposes of the Act"). This conduct, therefore, is akin to claims involving abuses of state power, subsumed under sovereign immunity. *Id.* at 1473; *see also* Mem. Op. (Mar. 1, 2007) at 18.[7] Furthermore, the plaintiffs' attempt to group these alleged intentional tortious activities under a theory of "negligence," based on the defendants' alleged failure "to anticipate the need for someone to properly oversee these thugs to insure that they not engage in overt criminal conduct," contradicts the plaintiffs' earlier allegations that "these thugs were hired with a view towards intimidating the Plaintiffs and injuring them," Am. Compl. ¶ 105, and, therefore, is merely contrived.[8] Because these alleged activities are noncommercial the defendants have sovereign immunity from the subject-matter jurisdiction of this court.

### 2. Claim IX Alleges Acts Constituting Commercial Activity, But Nevertheless Fails for Lack of Satisfactory Evidence

#### a. The Claim of Contractual Interference Qualifies as Commercial Activity

This court initially ruled that the allegations raised in Claim IX, "Malicious Interference with an Existing Contractual Relationship" qualified as commercial activities to invoke the subject-matter jurisdiction of this court. *See* Mem. Op. (Mar. 1, 2007) at 14. Specifically, the court regarded the alleged "commercial incentives" offered by the defendant ministries to the owners of the broadcasting company, as an attempt to "interfere with the plaintiffs' contract." *Id.* It held that this conduct "strips the defendants of immunity under FSIA because an individual,

---

[7]  The court previously denied the plaintiffs' remaining claims involving noncommercial activities, concluding that the alleged injuries plaintiffs suffered were based on actions constituting "discretionary functions" and involved a "measure of policy judgment" that fall outside the tortious act exception to FSIA immunity. Mem. Op. (Mar. 1, 2007) at 18.

[8]  The Supreme Court characterized plaintiff's additional claim that the State bore a duty to warn of their own propensity for tortious conduct, as "merely a semantic ploy" and rejected it because "[t]o give jurisdictional significance to this feint of language would effectively thwart the Act's manifest purpose to codify the restrictive theory of foreign sovereign immunity." *Saudi Arabia*, 507 U.S. at 1480.

acting in their private capacity, could interfere with a contractual relationship between another individual licensee and the licensor broadcaster." *Id*. at 15 (citing *Cicippio*, 30 F.3d at 166-167). However, having advanced to the final judgment stage of this litigation, the plaintiffs have still not provided evidence establishing the existence of a contractual relationship or supporting the tenuous connection between the alleged commercial activity and any resulting injury.

The plaintiffs' action is allegedly "based upon a commercial activity" carried on in the United States by a foreign State within the meaning of the first clause of §1605(a)(2). "Although the Act does not define 'based upon,' the phrase is most naturally read to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case, and the statutory context confirms that the phrase requires something more than a mere connection with, or relation to, commercial activity." *Saudi Arabia*, 507 U.S. at 349 (ruling that Congress manifestly understood there to be a difference between a suit "based upon" commercial activity and one "based upon" acts performed in "in connection with" such activity). According to amicus, the plaintiffs' claim is not "based upon" the alleged commercial inducement, but rather is "based upon" political speech. Society's *Amicus* Brief at 17 (citing *Saudi Arabia*, 507 U.S. at 357). Because the elements of the cause of action are relevant to the analysis of jurisdiction, the existence of a contractual relationship is critical to determine if relief is warranted. *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002) (noting that FSIA generally requires the application of state law principles to determine liability). Because the plaintiffs refer to a "contractual relationship" in labeling their cause of action but do not adduce evidence of its breach, the plaintiffs fail to establish the jurisdictional nexus to support this claim.

The plaintiffs allege that the defendants instigated an effort to interfere with the

practitioners' contract with Channel 56, Washington Chinese Television ("WCTV") in Fairfax, Virginia.  Am. Compl. ¶¶ 241, 245.  But they have not produced any evidence that interference has occurred or that their media access in this "local market" has been thwarted.  *See Langer v. George Washington Univ.*, 498 F. Supp. 2d 196, 202 (D.D.C. 2007)  (describing elements of contractual interference as (1) the existence of a contract, (2) defendant's knowledge of that contract, (3) intentional procurement of the contract's breach by defendant, and (4) damages resulting from the breach).

    The broadcast of television programs and the dissemination of news is broadly speaking commercial activity, but a broadcaster does not act in a commercial capacity if it is producing material as "the official voice of the government," for there it is acting in a governmental capacity.  *Chen v. China Cent. Television*, 2007 WL 2298360, at *5 (S.D.N.Y. Aug. 9, 2007) (citing *Bryks v. Canadian Broad. Corp*, 906 F. Supp. 204 (S.D.N.Y. 1995)) (concluding that CCTV's general activities are 'commercial,' despite its ownership by the government, but that the basis of the plaintiff's claims against CCTV – that CCTV engaged in a 'campaign of propaganda' – were not); *see also Gregorian v. Izvestia*, 871 F.2d 1515, 1522 (9th Cir. 1989) (finding no commercial action where stated-owned Soviet newspaper Izvestia was acting as the "voice of an official Soviet agency"); *Yessenin-Volpin v. Novosti Press Agency*, 443 F. Supp. 849, 856 (S.D.N.Y. 1978) (holding that Izvestia acted in a governmental capacity when producing "official commentary" of the Soviet regime).  The Society analogizes that here the defendants were also acting as the voice of the Chinese government.  And, indeed, the plaintiffs accuse the defendants of providing Channel 56's owner with "defamatory materials, brochures, pamphlets, videos and pictures, including a video."  Am. Compl. ¶ 244.  This is not commercial

activity. *See* Mem. Op. (Mar. 1, 2007) at 16 (construing plaintiffs' defamation claims as noncommercial because it is "simply not feasible for a private actor to abridge civil rights in the ways alleged by the plaintiffs").

However, bidding for a market service through a monetary inducement is a commercial activity because it is best conceived as the state acting as a player in the market, even if no profit motive exits. *See Guevara v. Republic of Peru*, 468 F.3d 1289, 1298-99 (11th Cir. 2006) (holding that foreign state's offer of reward for fugitive was commercial in nature, even though purpose (law enforcement) was sovereign); *Millicom Intern. Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 21 (D.D.C. 1998) (holding that Costa Rica's alleged anticompetitive actions (negotiating a contract, facilitating investment in the proposed cellular business and monopolizing the cellular services market) were commercial because they were not different than what a private player would do and were not uniquely sovereign). The Society maintains that the context of the exchange is China attempting to exercise political speech rather than to engage in commerce. Society's *Amicus* Brief at 17. But the fact remains that China is using commercial means to do so. *Compare Globe Nuclear Servs. and Supply (GNSS), Ltd. v. AO Techsnabexport*, 376 F.3d 282, 289-91 (4th Cir. 2004) (rejecting Russia's argument that contractual dealings regarding uranium were merely Russia exercising its sovereign right to regulate uranium market) *with Arizona Apple Orchards v. Guyana Pharm. Corp.*, 23 Fed. Appx. 708, 708 (9th Cir. 2001) (holding that Guyanese bank was not acting as private player in commercial market but rather was managing foreign exchange like a central bank).

### b. The Plaintiffs' Evidence Does Not Satisfactorily Establish Contractual Interference

Unfortunately for the plaintiffs, they have not proffered evidence connecting this price-

bidding by the defendants to their underlying claim of contractual interference with Channel 56, WCTV.  The plaintiffs simply refer the court generally to Exhibit 3 attached to their motion for default judgment, without providing any exegesis in a memorandum linking their proffered evidence and their claim.[9]  Pl.'s Mot. for Default J., at 3.  The court concludes, however, that Exhibit 3 contains no evidence substantiating the plaintiffs' claim of contractual interference.

The first document is an affidavit by Dong Xiang.  *Id.*, Ex. 3 at 1.[10]  Xiang, a manager at New Tang Dynasty Television[11] ("NTDTV"), claims that he called Mike Liu, the president of WCTV, on January 5, 2004 asking him to broadcast NTDTV's New Year Gala on a three-hour time slot on January 24, 2004.  *Id.*  A Chinese Central Television ("CCTV") show was substituted for NTDTV's program at the appointed time.  *Id.*  Xiang accuses a WCTV employee, Bing Li, of surreptitiously substituting the programs, but the plaintiff does not connect him in any fashion with the defendants, other than to allude vaguely to his alleged "close ties to the Chinese authorities."  *Id.* at 2-3, 6.  Mere conclusory allegations of possible second-degree influence do not, of course, suffice to demonstrate intentional procurement of the breach of the plaintiffs' contract by the defendant.

The second document consists of a compilation of alleged attempts by the PRC to

---

9       It may be noted that the court has no duty to comb through the record without direction from the parties.  *See Sierra Club v. U.S. Dep't of Interior*, 384 F. Supp. 2d 1, (D.D.C. 2004) (chastising party for "impos[ing] on the Court the obligation to comb through this extensive record to figure out what Plaintiffs are complaining about . . . . [and] want[ing] the Court to do the work of interpreting their chart and arguments for them").

10      This exhibit, too, is not paginated.  The court's page count begins on the first page after the cover page of the exhibit.

11      The plaintiffs state that "NTDTV supports freedom of expression in China and among overseas Chinese, and reports truthfully about the persecution of Falun Gong . . . and other information that the PRC tries hard to cover up."  Pls.' Mot. for Default J., Ex. 3 at 4 n.1.

interfere with NTDTV.  *Id.* at 4-6.  None of these, except the last which merely summarizes the events alleged by Xiang, concerns the plaintiffs' contract with Channel 56, the breach of which is the sole basis for the plaintiffs' claim of contractual interference as alleged in their amended complaint.  *Id.*  The document is, therefore, irrelevant.

The third document is an affidavit from Sen Nieh, a Falun Gong practitioner living in D.C., describing various efforts made by Chinese officials to influence Channel 56.  *Id.* at 7-12. Nieh alleges that "[s]ome time in the Spring of 2000, Washington[,] DC Falun Gong practitioners Mrs. Jane Yu Lopez[,] assisted by Mr. Dong Xiang[,] made an oral agreement with Mr. Wei-Ming (Mike) Liu . . . to show Falun Gong truth clarification programming films . . . on an irregular basis through December 2000, about one 30[-]minute segment every other week at a cost of $450/half-hour."  *Id.* at 7-8.  Nieh claims that in February 2001 and during the summer of 2001, the program was cancelled for a few weeks "without good explanation and notice from WCTV."  *Id.* at 8.  He states only that "[i]t is suspected Chinese Embassy pressured on [sic] WCTV."  *Id.*  The fact that Nieh admits that the Falun Gong programming was to air "on an irregular basis" coupled to his inability to raise anything other than unsubstantiated suspicions prevents his statement from supporting a default judgment.  *Smith*, 262 F. Supp. 2d at 224.

Nieh further alleges that, in a conversation with Liu on January 3, 2002, Liu informed him that a Chinese Embassy Deputy Counselor, Tian Xin Tan, requested Liu to stop airing the Falun Gong programs.  *Id.* at 9.  Tan allegedly invited Liu to several dinners with himself and other Chinese officials to pressure him to drop the programs.  *Id.* at 9-10.  He offered to provide WCTV with alternative popular programming and local business advertising contacts.  *Id.*  Mr. Nieh alleges that WCTV stopped the airing of Falun Gong programming "at least one or two

weeks," but Liu apologized to NTDTV and made up the time slots. *Id.* at 10. Nieh admits that "Liu generally did not yield to the Communist officials," and "the ill-will attempts by Communist officials on WCTV had little success." *Id.* at 10-11.

These facts fail to establish any claim for contractual interference. No written contact is ever mentioned. Nieh's reference to an "oral agreement" that entailed performance obligations allegedly covering multiple years is vague and, in any event, unsubstantiated by corroborating documentation.[12] The plaintiff does not proffer what is probably the most relevant, probative evidence of any contractual breach with Channel 56, to wit, an affidavit by Mike Liu confirming WCTV's contact with NTDTV. Nieh alleges that WCTV stopped the airing of Falun Gong programming "at least one or two weeks," but does not demonstrate when this occurred or that this was a breach of contract rather than an act within WCTV's discretion. The evidence here is simply too slim on which to hang a contractual breach claim.

The fourth document is an alleged PRC letter to CCTV broadcasting bureaus about NTDTV's New Year program on WCTV on January 24, 2004. *Id.* at 13-14. The document describes the program as "an attempt to expand the international impact of 'Falun Gong' . . . and interfere with the broadcasting of the CCTV's Spring Festival Show." *Id.* at 13. The letter states that the PRC "has ordered that they be destroyed by any and all means . . . . [W]e need to contain them and minimize their impact, so as to prevent them from interfering with our Spring Festival Show." *Id.* at 14. The document concludes by forbidding any CCTV bureaus from spreading the

---

12    Xian's affidavit only avers that Xian "ask[ed] [Liu] whether he could give the time slot to the NTDTV" for the New Year's Gala. Pls.' Mot. for Def. J., Ex. 3 at 1. He never refers to a contract or any consideration. Likewise, the letter from the PRC's State Administration of Radio, Film and Television to CCTV bureaus only indicates that the NTDTV program will broadcast on the "Washington DC Chinese Television Station" but does not aver any knowledge of a contract or its terms. *Id.* at 13.

Falun Gong programs and ordering the intensification of overseas propaganda.  *Id.*

Even assuming that this is an accurate translation of a genuine document, its contents do not rectify any of the plaintiffs' evidentiary deficiencies.  The letter does convey the wish that the Falun Gong or NTDTV be "destroyed," but the letter does not indicate that the PRC actually took any specific efforts to arrange for NTDTV's programming to be preempted.  Indeed, in Xian's affidavit, Bing Li is identified as the party responsible for the non-broadcast of NTDTV's program.  This letter may establish the PRC's motive or intent, but it does not sufficiently connect it with Li or his alleged actions.  It, therefore, does not support the plaintiffs' claim.

The fifth document, a redacted e-mail, is, according to the plaintiffs, a harassing letter sent by the defendants to NTDTV's sponsors.  *Id.* at 15.  The identity of the recipient of the letter is unknown because it has been redacted, but the sender is Dai Xi of the Commercial Office of the Chinese Embassy in D.C.  *Id.*  The letter makes no threats but vigorously denounces NTDTV as a proxy of the Falun Gong, which Xi describes as a cult that "preaches anti-humanity, anti-science and heretical fallacies and exercises extreme mental manipulation on followers."  *Id.* The letter protests the airing of NTDTV's Chinese New Year Gala on January 26 or 27, 2007. *Id.*  Addressing the recipient, Xi "suggest[s] that you could think over your sponsorship and withdraw it."  *Id.*  At most, this letter constitutes evidence of the defendants' knowledge of the plaintiffs' broadcasts and their supporters, but it does not remedy any of the aforementioned deficiencies crippling the other elements of the plaintiffs' claim; that is, it is not probative of (1) the existence of any contract; (2) that contract's breach; or (3) any injury to the plaintiff.

The sixth document is the testimony of Shiyu Zhou, NTDTV's Vice President, before the U.S. House of Representative's Committee on International Relations on July 21, 2005.  *Id.* at

16-29.  Zhou accuses the Chinese Communist Party generally of spreading anti-American and

Chinese nationalist propaganda in order "to recoup total control and popularity" over the

mainland Chinese population.  *Id.* at 16-17.  He describes alleged efforts by the PRC singling out

and attempting to sabotage NTDTV.  *Id.*  None of these, however, relate to the claim charged in

the complaint.  Indeed, when Zhou does recount an incident when the PRC attempted to pressure

the Kennedy Center into cancelling an NTDTV New Year Gala in February 2004, he concedes

that the Kennedy Center continued with the event.  *Id.* at 21.  Even assuming that Zhou's

testimony constitutes competent evidence, nothing in it tends to establish any of the elements of

the plaintiffs' claims.

The seventh and final document is what the plaintiffs purport to be a log of harassing

phone calls to the ticket hotline for NTDTV's 2007 New Year Gala at George Washington

University.  *Id.* at 30.  The log reflects eighteen calls from two different numbers on February 1[13]

between 1:05 and 1:16 a.m.  *Id.* at 32-33.  The plaintiffs do not connect these phone numbers

with the defendants, nor do they indicate how these 18 calls in the early morning hours interfered

with the New Year Gala or injured their contractual relations with Channel 56.  Because this

evidence is not probative of any of the elements of the plaintiffs' claim, this too is not evidence

satisfactory to the court upon which a default judgment may rest.

As discussed above, the plaintiffs have not shown that the defendants procured the breach

of the plaintiffs' contract or that the plaintiffs have suffered injury from any breach.  They have

not even produced a contract indicating that a switch in programming along the lines sought by

the defendants would constitute a breach.  *Santos v. Compagnie Nationale Air France*, 934 F.2d

---

[13]     No year is indicated, but the court presumes the calls were made in 2007 in reference to the 2007
New Year's Gala.

890, 891 (7th Cir. 1991) (holding that immunity not waived because sovereign's commercial activity did not result in a claim of injury).  The plaintiff seeking a default judgment against a foreign sovereign must present evidence on each of the necessary elements of its claim.  *Ungar*, 211 F. Supp. 2d at 98.  Because the plaintiffs have failed to support these allegations with evidence that the defendants caused the breach of any of the plaintiffs' contractual relations or with evidence indicating the amount of damages from any putative breach, the court denies their motion for default judgment.


## IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiffs' motion for default judgment and dismisses the plaintiffs' remaining causes of action.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 3rd day of June, 2008.


Ricardo M. Urbina
United States District Judge